943 F.2d 56
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Margaret S. VIALL, Plaintiff-Appellee,
v.
John SCOTT, Sr., et al., Defendants,
and
James R. Clark, Gene Hutchins, Defendants-Appellants.
 Nos. 88-15034, 88-15035.
 United States Court of Appeals, Ninth Circuit.
 Submitted Nov. 9, 1990.*
Decided Sept. 10, 1991.
 
 Before CHAMBERS, ALARCON and BRUNETTI, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Facts and Proceedings.
 
 
 3
 Appellants Clark and Hutchins were directors of North American Currency and Coin, Inc. ("NACC"). Clark was a director from the time of the company's formation in 1975 until NACC's bankruptcy in September, 1982. In addition, Clark was Vice-President, Secretary, and Treasurer of NACC from 1975 until October 2, 1981. Hutchins was a director from the time of the incorporation in 1975 until his failure to be reelected at an October 15, 1980, shareholders meeting.
 
 
 4
 The nature of NACC's business is in dispute. NACC was primarily a precious metals brokerage firm. Appellants argue that they would temporarily hold, as part of their metals trading business, metals belonging to their clients until the clients arrived to claim them. They deny being in the business of storing their clients' metals. Appellee Margaret Viall claims that, in addition to providing brokerage services, NACC had a second business of storing the precious metals owned by its customers.
 
 
 5
 In 1979 Viall owned approximately 136,000 ounces of silver bullion stored in a Swiss bank. In February, 1980, Viall decided to move some of the silver to the United States and contacted Sherman Unkefer, the president of NACC. Viall testified that Unkefer agreed to store her silver separately from other silver and that he promised that her name would be on the bags of silver. Viall then instructed her Swiss bank to transfer 100,000 ounces of the bullion to the account of NACC in London. NACC then purchased 154 bags of silver coins for Viall's account. NACC sent Viall a letter stating:
 
 
 6
 This letter will acknowledge receipt in our account ... of 100,000 oz. .999 fine silver bullion.
 
 
 7
 This bullion has been exchanged for 154 bags, $1,000.00 face value per bag, of U.S. silver coin....
 
 
 8
 Our storage charge will 2/10's of 1% per annum of the average value of the bags for the previous 12 months.
 
 
 9
 This service charge was paid by Viall.
 
 
 10
 Several documents were produced at trial indicating that 154 bags of silver were received by NACC and placed in a "Hold Box" on behalf of Viall. Viall received a letter dated February 28, 1980, from NACC with a heading labeled: "HOLD BOX." The letter stated it was "a receipt for the following coins which we are holding for you: ... 154,000 face U.S. Silver Bags (90%)." It also stated, "[t]he above coins may be picked up or liquidated upon payment of all holding charges."
 
 
 11
 In 1981 Viall became concerned about the lack of documentation concerning her silver and asked her son-in-law, who was traveling to Phoenix, to "[g]o visit my money." Her son-in-law testified that Unkefer "had assured me that the silver bags had been purchased, and that they were in storage." The son-in-law visited the NACC vault and "observed shelving and product setting on shelving. And this was product that had ... small coin containers and had specific customer names on those containers."
 
 
 12
 In April, 1981, NACC created a subsidiary, North American Depository ("NAD"), to store NACC customers' metal. Clark testified that
 
 
 13
 there was a major emphasis in the company to get anything that was being held in the do-not-ship or the hold box, either to pick it up or to move it into the depository.... And that way you eliminate any doubt, you go ahead and get into the storage business officially, get it taken down to the vault, get it segregated, tagged, all of these things that you're talking about.
 
 
 14
 Viall's coins were never transferred from the NACC Hold Box to the NAD subsidiary.
 
 
 15
 When the precious metals market fell in the early 1980s, NACC began to experience financial trouble. On September 23, 1982, NACC filed for bankruptcy. NACC did not produce for Viall any bags of silver. Viall pursued a claim in the bankruptcy proceedings and filed suit against NACC, the directors and officers of NACC, and NACC's accounting firm.
 
 
 16
 Viall's first amended complaint included a claim "for conversion" and alleged that the defendants were liable under the Commodity Exchange Act and as aiders and abettors and conspirators of common law conversion. The complaint also included a fraud claim.
 
 
 17
 The defendants filed a summary judgment motion on the conversion and fraud claims. The court granted the motion as to "plaintiff's claims under the Commodity Exchange Act and on plaintiff's common-law fraud claim." The motion was denied as to "plaintiff's claim for conversion." Viall did not subsequently amend her pleadings until the day of trial.
 
 
 18
 In the pretrial order, Viall specified numerous issues in dispute that sounded in negligence. Clark contended that each of these points were not within the purview of Viall's complaint. On the first day of trial, Clark argued that the question of appellant's negligence was not an issue at trial because it was not pleaded in the complaint. Viall, relying on the pretrial conference order and questions asked in interrogatories, argued that the appellants had notice of Viall's theory of liability and would not be prejudiced by an amendment. The court then permitted Viall to amend her complaint and ruled the amendment relates back to the date of the original complaint. At the conclusion of Viall's presentation of evidence, the district court granted Clark's motion for a directed verdict on the issue of conversion. The trial continued on the issue of the appellants' negligence.
 
 
 19
 The court instructed the jury in part as follows:
 
 
 20
 The first thing that you should decide is whether NACC agreed to store a specific 154 bags of silver coins for Mrs. Viall. She has the burden of proving that NACC agreed to do so.
 
 
 21
 If you decide that NACC did not agree to store a specific 154 bags of silver coins for Mrs. Viall, you need to deliberate no further but should return a verdict in favor of Mr. Clark and Mr. Hutchins and against Mrs. Viall.
 
 
 22
 The court then instructed the jury that if they find NACC agreed to store Viall's silver, they must decide whether the appellants breached their duty of care toward Viall. The court told the jury that a corporate director "is not liable for acts of the corporation merely because he is a director," and described the scope of appellants' duty as "that degree of diligence, care and skill that an ordinarily prudent person would exercise in acting as a director under similar circumstances." The jury was instructed to determine whether they breached that duty, and if so whether the breach was a proximate cause of her loss. Appellants objected to the court's failure to give the following requested instruction:
 
 
 23
 An officer or director of a corporation may not be held liable for the wrongful acts of a corporation unless they have personally authorized or participated in such acts.
 
 
 24
 The jury found for Viall and awarded her $2,213,000.00 in damages. This amount was reduced to reflect Viall's recovery in bankruptcy proceedings. The final judgment was for $1,764,980.00 in damages plus $1,447,773.87 in prejudgment interest and costs of $5,763.81; a total of $3,466,040.21.
 
 
 25
 Discussion.
 
 
 26
 I. Duty of the directors of NACC.
 
 
 27
 The district court instructed the jury that it could find the appellants liable for the loss of Viall's silver if it found the appellants negligently supervised the corporation and that such negligence was the proximate cause of Viall's loss. Appellants argue that a director or officer of a corporation cannot, as a matter of Arizona law, be found liable to nonshareholders for negligent management or supervision of the corporation. We review a district court's interpretation of state law de novo. Matter of McLinn, 739 F.2d 1395, 1397 (9th Cir.1984) (en banc).
 
 
 28
 Appellants cite several authorities that support the proposition that a director or officer is not liable for the torts of the corporation unless he authorized or participated in the wrongful actions. See, e.g., Maloof v. Raper Sales, Inc., 113 Ariz. 485, 557 P.2d 522, 525 (Sup.Ct.1976) (en banc), In re Arizona Bank's Estate, 42 Ariz. 62, 22 P.2d 409 (1930). Viall agrees that this is true for most types of corporate torts but argues that "a different set of rules applies when the corporation is involved in the storage of property for third persons." In such cases, Viall argues, the directors are subject to a greater duty of care toward the corporation's clients.
 
 
 29
 Viall relies on Jabczenski v. Southern Pac. Memorial Hospitals, 119 Ariz. 15, 579 P.2d 53 (Ariz.App.1978). In Jabczenski, plaintiffs were employees of a nonprofit medical services corporation. The employees entered into deferred compensation agreements with the employer. Plaintiffs provided affidavits stating that the business manager in charge of organizing the agreements told employees "that the specific monies deferred from affiant's periodic salary would be invested in life insurance annuity policies upon the life of affiant and for the affiant." 579 P.2d at 57.
 
 
 30
 When the employer corporation began having financial difficulties it entered into an agreement with Health Maintenance Foundation ("HMF"), a California nonprofit corporation. The employer transferred all its assets and liabilities and later assigned the annuity contracts to HMF. The president of HMF cashed the annuity contracts and some of the proceeds were deposited into certificates of deposit and some was spent on HMF expenses. The HMF board of directors, including defendant Dr. Upjohn, later ratified the expenditure. Id. at 56. Soon after, HMF filed a petition under Chapter 11 of the Bankruptcy Code.
 
 
 31
 The employees sued the employer and Dr. Upjohn for fraud, conversion, breach of contract, and conspiracy. The defendant's summary judgment motion was granted and the employees appealed claiming there was an issue of fact as to whether the deferred compensation funds were held in trust. Id. at 57. The Arizona appeals court reversed.
 
 
 32
 The court first determined that there remained a factual issue of whether a trust was created. If the monies were determined by the fact finder to be held in trust, the court stated, then their disposition by HMF would be a conversion of the trust property. The court then discussed the potential liability of a director of HMF. The court stated,
 
 
 33
 Corporate directors are not personally liable for conversion committed by the corporation or one of its officers merely by virtue of the office they hold. To be held liable, the directors must participate or have knowledge amounting to acquiescence or be guilty of negligence in the management and supervision of the corporate affairs causing or contributing to the injury.... A director who actually votes for the commission of a tort is personally liable, even though the wrongful act is performed in the name of the corporation.
 
 
 34
 Id. at 58.
 
 
 35
 Though a finding of negligence was arguably unnecessary to find that Dr. Upjohn could be liable as he ratified the improper expenditures, we believe Jabczenski expresses the law of Arizona on this question. Allowing the jury to consider the negligence of the appellants was not, on the facts of this case, erroneous.
 
 
 36
 II. Jury instructions.
 
 
 37
 Appellants make several arguments regarding the district court's jury instructions. We review challenges to the district court's formulation of jury instructions for abuse of discretion. United States v. Beltran-Rios, 878 F.2d 1208, 1214 (9th Cir.1989).
 
 
 38
 Clark argues that the jury should have been instructed that it had to find that a conversion had occurred. Such an instruction was not necessary. If the jury found that NACC was storing her silver, the court could find as a matter of law that NACC converted her silver by virtue of the fact that the silver was not turned over to her upon her request. See Jabczenski, 579 P.2d at 58 (conversion is based "upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results") (quoting Poggi v. Scott, 167 Cal. 372, 139 P. 815, 816 (1914)). Appellants agree that Viall's silver was not returned to her and therefore the jury needed to determine only whether NACC agreed to store Viall's specific bags of silver in order to find a conversion occurred as a matter of law. The next inquiry was whether the appellants could be found responsible for the conversion. The instructions were not erroneous.
 
 
 39
 Clark argues next that the jury was incorrectly instructed on the determination of damages. Citing the Restatement (Second) of Torts, he argues that Viall should recover "the highest replacement value of the [silver] within a reasonable period during which he might have replaced it." This "reasonable period," Clark asserts, does not begin to run until Viall knew or had reason to know of the conversion after the filing of NACC's bankruptcy petition.
 
 
 40
 The court instructed the jury that if it found the appellants liable for Viall's loss,
 
 
 41
 [y]ou must first determine the date on which NACC failed to have a specific 154 bags of coins in storage for Mrs. Viall. Mrs. Viall would be entitled to be awarded the highest value of her bags of silver coins on the date NACC failed to have them in storage for her or between the time that she discovered her loss and had a reasonable opportunity thereafter to replace them.
 
 
 42
 (Emphasis added). Clark argues that the Restatement authorizes, in the case of fluctuating commodities like silver, only the emphasized portion of the instruction and the court erred by offering the jury the alternative method of determining damages. Clark provides no authority, from Arizona or otherwise, that requires only the latter portion of the instruction. The Restatement is certainly helpful in drafting jury instructions but is not binding on district courts. We do not believe the court abused its discretion in providing the alternative method of determining damages.
 
 
 43
 Clark also argues that the damage instruction is erroneous because judge's reference to "a specific 154 bags of coins" "was a comment on the evidence which effectively chose Viall's legal position and testimony over Clark's." The jury considered the damage only after finding NACC agreed to store a specific 154 bags of silver for Viall. If the jury did not find that NACC agreed to store specific bags then they would never consider the damage instruction. The instruction was not an abuse of discretion.
 
 
 44
 Hutchins argues that the district court erred in failing to include an instruction that "[a]n officer or director of a corporation may not be held liable for wrongful acts of a corporation unless they have personally authorized or participated in such acts." Because we find that the directors of a corporation entrusted with property of others may be found liable for negligent supervision under Arizona law, supra part II.A., the court did not abuse its discretion in rejecting this instruction.
 
 
 45
 III. The jury's finding that NACC agreed to store Viall's silver.
 
 
 46
 A finding of liability based on the negligent supervision of the appellant directors must be predicated upon the determination that NACC held Viall's silver in trust for her. Accordingly, the jury was instructed to find for appellants if it found that NACC did not agree to store Viall's specific silver. On appeal, our review is limited to determining whether there is substantial evidence to support the jury's verdict. Landes Constr. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1370-71 (9th Cir.1987).
 
 
 47
 The jury had before it a letter from NACC stating that NACC was "holding for [Viall]" 154 bags of silver coins that may be "picked up" by her. Several documents indicate that the silver was being stored in a "Hold Box." Even if the Hold Box does not refer to a physical "box," the jury could reasonably believe that these documents indicate NACC was physically storing her silver. Viall was also charged a "storage fee" for NACC's services. Viall testified that the President of NACC agreed to hold and segregate her silver. Viall's son-in-law testified that he was shown specific bags of silver with tags listing the customer's names on them in a NACC vault. In addition, the jury could reasonably have found the creation of the NAD subsidiary in 1981 was not a new business venture for NACC, but rather a new legal entity which merely continued NACC's practice of holding the specific metals of its clients in the Hold Box. We conclude that the jury had sufficient evidence for a jury to find that NACC agreed to hold Viall's specific bags of silver.
 
 
 48
 IV. Liability of appellants.
 
 
 49
 Appellants next argue that even if they could be liable as a matter of law, there is not substantial evidence to support the verdict. "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." Landes Constr., 833 F.2d at 1371.
 
 
 50
 1. Appellant Clark.
 
 
 51
 Clark was Vice-President, Secretary, and Treasurer of NACC from 1975 until October 2, 1981.[1] After this date he continued as a director until the corporation's bankruptcy and "as a consultant for the firm under the same employment terms" until the end of 1981. Clark was in charge of the vault where the metal was stored and responsible for the documentation involved in the storage of the metal. Clark was also responsible for trading, accounting, back office, security, shipping and receiving, and banking until September 1979. At that time he became the head trader responsible for the matching of buy and sell orders. The jury also viewed a letter from NACC's President stating Clark's responsibilities included "Responding personally to or delegating to a member of your department the proper handling of physical product needs." Given Clark's extensive responsibilities regarding the storage of clients' metals at NACC, the jury could reasonably conclude that Clark negligently failed to supervise or manage the operations of NACC and his negligence was the proximate cause of her loss.
 
 
 52
 2. Appellant Hutchins.
 
 
 53
 Hutchins was an original incorporator, shareholder, and director of NACC. During his five years as a director he attended two or three board of directors meetings. Hutchins could recall very little of the substance of these meetings and knew nothing about the Hold Box. When asked if he had "any knowledge of how NAC [sic] was doing business, insofar as transactions such as Mrs. Viall's was concerned," Hutchins replied, "No." He testified that he was never informed about any financial problems the corporation was having prior to the bankruptcy filing, and that he made no investigation or asked any questions to determine if there were any financial problems at NACC.
 
 
 54
 His involvement in the corporation appears to extend to these few meetings and having lunch with Unkefer where they "spent an hour or two in general discussion." He recalls no discussions regarding possible safeguards "to make certain that customers' precious metals were being segregated, earmarked, and properly stored for them." When asked if he "ever ma[d]e any independent investigation as to what methods were being used to check in and out customers' property into the vault," Hutchins replied
 
 
 55
 No, not exactly as you describe it. But I do remember one discussion where I asked what the security was in that vault, and Mr. Unkefer told me. And I suggested there might be more security, twenty-four hour security.
 
 
 56
 There is substantial evidence for the jury to conclude that Hutchins' failure to manage or even understand NACC's system of holding its clients' metals was negligent toward those clients and constituted a proximate cause of Viall's loss.
 
 
 57
 V. Amendment of the complaint and relation back.
 
 
 58
 Appellants argue that allowing Viall to amend her complaint on the first day of the trial was improper. This court reviews the district court's decision to allow the amendment for an abuse of discretion. Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir.1989).
 
 
 59
 Federal Rule of Civil Procedure 15(b) provides:
 
 
 60
 When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment ... may be made upon motion of any party at any time, even after judgment.... If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits.
 
 
 61
 Fed.R.Civ.P. 15(b).
 
 
 62
 We have "stressed Rule 15's policy of favoring amendments, and we have applied this policy with liberality.... The district court's discretion to amend is particularly broad where plaintiff has previously amended the complaint." Ascon Properties, 866 F.2d at 1160. "The propriety of a motion for leave to amend is generally determined by reference to several factors: (1) undue delay; (2) bad faith; (3) futility of amendment; and (4) prejudice to the opposing party." Hurn v. Retirement Fund Trust of Plumbing, Heating & Piping of Southern Calif., 648 F.2d 1252, 1254 (9th Cir.1981). In the present case, there is no indication that Viall's late amendment was due to bad faith. The amendment was also not futile. "The delay by permitting an amendment to the complaint cannot alone justify the denial of leave to amend." Id. at 1254-55. As appellant Clark argues, the pertinent inquiry is the degree of prejudice to the appellants.
 
 
 63
 The appellants argue that Viall's delay in amending her complaint unduly prejudiced them. The delay, they argue, precluded cross-claims against codefendants or filing a third party complaint for indemnity. The amendment altered the theory of the case from conversion to negligence and, appellants claim, they were unprepared to defend against this theory.
 
 
 64
 Although the pleadings at the time of trial made no claim based on negligence, the pretrial order clearly set forth Viall's negligent supervision theory of liability. The "pretrial order ... supersedes the pleading ... and 'controls the subsequent course of the action.' " Donovan v. Crisostomo, 689 F.2d 869, 875 (9th Cir.1982) (quoting Fed.R.Civ.P. 16). Regardless of Clark's protestations that negligence was not "within the purview of the complaint," Viall's theory of liability was made clear in the pretrial order. At the latest, therefore, from the time of the pretrial conference Clark was on notice of Viall's theory of the appellant's liability. The district court acted within its discretion in allowing Viall to amend her complaint.
 
 
 65
 Clark argues that even if permitting the amendment was not an abuse of discretion, the amendment should not be allowed to relate back to the date of the filing of the first amended complaint.
 
 
 66
 Federal Rule of Civil Procedure 15(c) provides:
 
 
 67
 Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.
 
 
 68
 Fed.R.Civ.P. 15(c). If the amendment refers to the same set of facts as the original complaint then the case should not be time-barred because the defendant has been on notice of the facts giving rise to the injury complained of. Percy v. San Francisco General Hosp., 841 F.2d 975, 979 (9th Cir.1988). "Fairness to the defendant demands that the defendant be able to anticipate claims that might follow from the facts alleged by the plaintiff." Id. The determination of whether a new claim arises out of the same conduct, transaction, or occurrence as set forth in the original pleading is reviewed de novo. Id. at 978.
 
 
 69
 Viall's first amended complaint alleged the appellants were liable:
 
 
 70
 (a) As direct participants in a violation of 7 U.S.C. 6(b) and 6(o), in that as directors of NACC, they were required to exercise command and to supervise the officers and employees of NACC so as to insure that NACC, its correspondents, agents or employees, did not violate 7 U.S.C. 6(b) and 6(o). The said Individual Defendants failed to exercise proper command and supervision, and as a result thereof, the violations of 7 U.S.C. 6(b) and 6(o) alleged herein occurred.
 
 
 71
 VI. Statute of limitations.
 
 
 72
 Clark argues that regardless of the relation back of the amendment, Viall's claim is barred by Arizona's statute of limitations. In Arizona, tort actions "shall be commenced and prosecuted within two years after the cause of action accrued." Ariz.Rev.Stat. § 12-542 (West Supp.1990). Clark argues the cause of action accrued on either March 28, 1980, when the jury determined the loss occurred, or at the latest when he resigned on October 2, 1980. Though a cause of action generally accrues at the time the tort was committed, Jackson v. American Credit Bureau, Inc., 23 Ariz.App. 199, 531 P.2d 932 (1975), if the plaintiff neither knew nor reasonably should have known of the tortious conduct, the cause of action does accrue until that time. Yazzie v. Olney, Levy, Kaplan & Tenner, 593 F.2d 100, 103 (9th Cir.1979), Kellogg v. Willy's Motors, Inc., 140 Ariz. 67, 680 P.2d 203, 206 (Ariz.App.1984). Thus, even if Clark's negligent conduct must have occurred prior to Clark's resignation, the pertinent date is the date Viall knew or should have known of the conduct. Appellants do not argue that Viall either knew or should have known of the loss of her silver prior to NACC's bankruptcy in September, 1982. Accordingly, Viall's action is not time-barred.
 
 
 73
 VII. Effect of directed verdict on conversion claim.
 
 
 74
 The district court granted Clark's motion for a directed verdict on the issue of conversion by the appellants. Clark also moved for a directed verdict on the issue of negligence. After hearing arguments, the court denied the motion. Clark argues that the district court "should have ended the trial" when it granted his motion for a directed verdict on the issue of conversion. Clark's argument assumes that Viall's amendment altered the facts of his conversion claim only, and did not assert a claim based on negligence. The amendment states:
 
 
 75
 The individual defendants are liable for the loss of plaintiff's silver for the following reasons: As corporate directors and/or officers of NACC, they had a duty to properly manage and supevise the affairs of the corporation so as to insure that the interests and property of NACC customers, such as plaintiff, were protected. Defendants breached this duty by failing to properly manage and supervise the affairs of the corporation. As a proximate result of defendants' nonfeasance and breach of this duty, plaintiff's property was lost and/or converted.
 
 
 76
 This allegation clearly states a claim for negligence and we find Clark's claim without merit.
 
 
 77
 VIII. Hearsay.
 
 At trial, Viall testified:
 
 78
 ... I asked [Unkefer] how [the silver] would be stored. That I wanted it stored separately. I didn't want it comingled [sic]. And I wanted my name on the bags.
 
 
 79
 Q. And what did Mr. Unkefer say to you?
 
 
 80
 A. That that's the way it would be stored.
 
 
 81
 Clark argues that the admission of this testimony is inadmissible hearsay. We review a district court's hearsay ruling under the abuse of discretion standard. Gilchrist v. Jim Slemon's Imports, Inc., 803 F.2d 1488, 1501 (9th Cir.1986).
 
 
 82
 It appears the testimony was not offered to establish that the silver was in fact stored in the manner described; rather, to show that Unkefer "uttered words of assent, regardless of their 'truth.' " N.L.R.B. v. H. Koch & Sons, 578 F.2d 1287, 1290 (9th Cir.1978). Regardless of Unkefer's intent to store the silver as he agreed or whether the silver was actually store in this manner, his words of agreement have a legal significance independent of their truth and are therefore not hearsay. Id. at 1290-91; United States v. Rubier, 651 F.2d 628, 630 (9th Cir.1981). The district court did not abuse its discretion in permitting the testimony.
 
 
 83
 IX. Prejudgment interest.
 
 
 84
 The district court granted Viall's motion to amend the jury award to include prejudgment interest. Clark argues that prejudgment interest is improper in this case because Viall's claim was not liquidated. An award of prejudgment interest is reviewed for an abuse of discretion. Vance v. American Hawaii Cruises, Inc., 789 F.2d 790, 794 (9th Cir.1986).
 
 
 85
 Under Arizona law, "[p]rejudgment interest on a liquidated claim is a matter of right.... This is true whether the liquidated claim sounds in tort or contract." Fleming v. Pima County, 141 Ariz. 149, 685 P.2d 1301, 1307 (1984) (en banc) (citations omitted).
 
 
 86
 [A] claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion.
 
 
 87
 Trus Joist Corp. v. Safeco Ins. Co. of America, 153 Ariz. 95, 735 P.2d 125, 139 (Ariz. App.1986).
 
 
 88
 Clark argues that there was conflicting evidence at trial regarding the date of Viall's loss. This uncertainty, they argue, renders her claim unliquidated. A similar argument was made in Trus Joist. There the court stated:
 
 
 89
 A claim is not considered unliquidated merely because the jury must find certain facts in favor of the plaintiff in order to determine the amount of damages. All that is necessary is that the evidence furnish data which, if believed, makes it possible to compute the amount with exactness.
 
 
 90
 Id.
 
 
 91
 The jury determined the value of Viall's loss by multiplying the amount of her silver being stored by NACC on March 28, 1980, by the value of the silver on that date. This date was apparently determined by relying on a letter dated March 27, 1980, stating that Viall's bags of silver were being stored by NACC. This is the last document indicating the silver was being stored by NACC. If the jury believed that the loss occurred on March 28, 1990, it was certainly possible to determine the amount of damages because the value of the silver on that date is undisputed. The district court, therefore, did not abuse its discretion in awarding prejudgment interest.
 
 
 92
 AFFIRMED.
 
 
 93
 (b) As aiders and abetters and as co-conspirators in connection with the alleged violations of 7 U.S.C. 6(b) and 6(o) and the conversion alleged herein.
 
 
 94
 The amendment alleged the appellants were responsible for the conversion by NACC of Viall's silver as a result of their negligent supervision and management of NACC. Both allegations relate to the conversion of the silver by NACC and the appellants responsibility for failing to prevent that conversion.
 
 
 95
 Clark argues that the "scope of scrutiny of Clark's actions" is much greater under the amendment and the "factual issues raised by the negligent mismanagement claim [are] very different from those ... in the common law conversion claim." Here, although the amendment clearly raises new issues, it just as clearly relates to the same conduct, transaction, or occurrence--the conversion of the silver by NACC and the appellants' responsibility for that conversion--as the first amended complaint. The district court properly permitted the amendment to relate back.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); Circuit Rule 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Circuit Rule 36-3
 
 
 [1]
 Clark testified that he believed that he was resigning from his position as a director as well. The letter made no reference to this, however, and Arizona law requires that a director's resignation must be in writing. Ariz.Rev.Stat. § 10-036